IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | No. 10-20042-Ml/P |
| DEMARCO TUGGLE, ) | |
| ) | |
| Defendant. ) | |

_____

# REPORT AND RECOMMENDATION
_____

Before the court by order of reference is defendant Demarco Tuggle's Motion to Suppress Evidence, filed September 24, 2010. (D.E. 27.) The United States ("government") filed a response in opposition on October 6, 2010. At the suppression hearing, the court heard testimony from two government witnesses, Memphis Police Department ("MPD") Detectives Jewell Yancey and Brian Nemec. The court also heard testimony from Tuggle and his two witnesses, Lavonzell Ward and Corsett Vasser. The court admitted into evidence aerial photographs (Exs. 1, 4-6), a photograph of the pistol found in Tuggle's vehicle (Ex. 2), and a photograph of the car radio in Tuggle's vehicle (Ex. 3).

Based on the briefs filed in support of and in opposition to the motion, the evidence presented at the hearing, and the entire record, the court submits the following proposed findings of fact and conclusions of law, and recommends that the Motion to Suppress

be denied.

## I. PROPOSED FINDINGS OF FACT

As an initial matter, the court finds, based on the witnesses' demeanor as they testified, their motives for testifying, and the substance of their testimony, the testimony of the detectives to be credible and the testimony of Tuggle and his witnesses to be not credible. Therefore, the court adopts the detectives' version of the events as set forth below.

At around midnight on July 19, 2008, officers with the MPD's Organized Crime Unit were patrolling "hot spots" in the Memphis area as part of "Operation Summer Heat."[1] As the officers approached the intersection of Breedlove and Vollintine, they observed a group of seven to ten men and women standing in the parking lot of a grocery store located at 962 Vollintine. The business was closed for the evening. The officers observed some of the individuals consuming alcoholic beverages, and the officers also saw beer cans and bottles on top of the vehicles parked at the location. This area was known to the officers to be a high crime area, especially for drug activity and robberies. Approximately five to ten officers, who were traveling in three police cars, pulled into the parking lot. The officers, including Detectives

---

[1] "Hot spots" refers to areas with statistically high drug activity and other serious crimes. "Operation Summer Heat" was an effort by MPD to saturate certain high crime areas of Memphis with officers to detect criminal activity.

Yancey and Nemec, exited their vehicles and approached the individuals. The officers were wearing shirts and vests with "police" written on them. However, the officers did not have their guns drawn, nor did they activate their blue lights or sirens.

The detectives started talking to the individuals and asked them what they were doing in the parking lot. Although one of the men was visibly inebriated, the other individuals were calm and cooperative with the officers during the entire encounter. Within a few minutes, one of the men, Lavonzell Ward, informed the detectives that he had a pistol on him. Detectives Yancey and Nemec secured the pistol, and officers attempted to determine whether Ward had a permit to carry the weapon.[2] During this time, some of the officers started walking around the cars parked next to the individuals. Other officers asked the individuals for their identification and checked their identification information on Station B. One of the men whose identification was checked was Demarco Tuggle. According to Detective Nemec, Tuggle did not have any alcoholic beverage in his hand and did not appear to be inebriated. Detective Yancey described the encounter as follows:

>   Q.   Okay. So, at what point during this discussion, is that how you would describe this -- you tell me. How would you describe your interaction with these seven to ten people when you pulled up?
>
>   A.   I just, hey, how y'all doing? My name is Detective

---

[2] The officers later discovered that Ward had a handgun carry permit for the pistol.

Yancey. What y'all doing on this lot drinking?

Q. So, how long did it take before you got to the point where somebody asked if he had a gun?

A. Once we approached him, I got into -- I was comingling with the crowd more so than anyone else, and then I was asking everybody who they were, who they were with. And that is when [Lavonzell Ward] said, I do have a weapon.

Q. So, approximately, as best you can remember, from the time you pulled up until --

A. Almost two or three minutes.

. . . .

Q. Okay. At that point, were they free to go? If Mr. Tuggle wanted to walk away right then, could he have said, I ain't got time for y'all, I've got to go?

. . . .

A. More than likely, no.

Q. More than likely, no?

A. If his identification was still being checked. Once we checked his identification, if he wanted to leave at that point, he could have.

. . . .

Q. Okay. When you -- part of your discussion with these people, including Mr. Tuggle, was you wanted to see their driver's license, their identification, correct?

A. Their identification, yes.

Q. And it's your testimony now that he would not be free to leave unless he had shown his identification first, correct?

A. After we checked him, yes.

Q. I'm not trying to pick on you. I just want to make sure I'm clear about this. Isn't it true that Mr. Tuggle, or really anybody there, would [not] have been free to leave until their identification was checked, correct?[3]

A. Correct.

Q. Okay. Was it made clear to them that that was the case?

A. Yes.

(Tr. at 30-33.)

Approximately five to ten minutes after initially approaching the group, Detective Nemec observed a red Lincoln Towncar parked in the parking lot and asked who owned the car.[4] Tuggle stated that the vehicle belonged to him. Detective Nemec asked Tuggle if he could search the vehicle and Tuggle responded, "Yeah, go ahead and search it, there is nothing in it." Based on Tuggle's consent, Detectives Nemec and Yancey went inside the Towncar and began searching it. The detectives noticed that the car had an after-market radio that was not installed securely and was protruding out of the dashboard. Detective Nemec pulled the radio out, at which

---

[3] Although the transcript from the hearing omits the word "not" from this question, it is clear from the questions and answers leading up to this question that Tuggle's counsel asked Detective Yancey whether Tuggle "would not" have been free to leave until his identification was checked.

[4] Detective Nemec testified that the officers were on the scene for only five to ten minutes before he asked Tuggle for consent to search his car, whereas Detective Yancey testified that it was approximately thirty minutes. The court finds that Detective Nemec's testimony is more reliable on this issue, as he was the one who actually asked Tuggle for consent to search.

-5-

time he saw a pistol tucked behind the radio. Detective Nemec removed the pistol and discovered that it was loaded. Once Tuggle realized the officers recovered the pistol from his vehicle, he became angry and stated that he bought the car two weeks ago and that the gun was already in the car when he bought it.[5] The officers ran the pistol's serial number on Station B and learned that the pistol had been reported stolen three days earlier. Subsequently, Tuggle was placed under arrest. Overall, the encounter between the officers and the individuals lasted approximately thirty minutes. Other than placing handcuffs on Tuggle when he was arrested, at no point were handcuffs placed on any of the other individuals, nor were any of the other individuals arrested.[6]

## II. PROPOSED CONCLUSIONS OF LAW

In his motion to suppress, Tuggle argues that the officers

---

[5]Tuggle's counsel stated at the suppression hearing that Tuggle does not seek to suppress this statement on the grounds that the statement was made in violation of his Miranda rights or was coerced. He only seeks to suppress the statement based on it being the fruit of the illegal detention.

[6]Ward and Vasser, both of whom were present in the parking lot and consider themselves Tuggle's "good friends," testified that when the officers initially approached their group, all of the officers drew their weapons, ordered them to place their hands on the cars, searched them, and placed them in handcuffs. They also testified that the officers searched Tuggle's car without first asking him. Ward further testified that the radio in Tuggle's car did not protrude out of the dashboard. Tuggle testified that he did not give the officers consent to search his car. As discussed above, the court finds this testimony, which directly contradicts the detectives' testimony, to be not credible.

violated his Fourth Amendment rights by detaining him without reasonable suspicion. He further alleges that the officers searched his car without his consent.[7] Regarding Tuggle's second argument, the court has already found that Detective Nemec, in fact, obtained Tuggle's consent prior to searching the Towncar. Thus, the only issue remaining is whether the officers detained Tuggle under <u>Terry v. Ohio</u>, and if so, whether they had the requisite reasonable suspicion to justify the investigative detention and whether the degree of intrusion was reasonable.

There are three types of encounters between police officers and citizens: "(1) the consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigative detention, which, if non-consensual, must be supported by a reasonable articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." <u>United States v. Waldon</u>, 206 F.3d 597, 602 (6th Cir. 2000). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." <u>Terry v. Ohio</u>, 392 U.S. 1, 19 n.16 (1968). "[I]n order to determine whether a particular encounter constitutes a seizure, a court must consider

---

[7]Tuggle does not allege that the consent was given involuntarily or that the officers exceeded the scope of the consent. Instead, he claims that the officers searched his car without asking his permission.

all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." Florida v. Bostick, 501 U.S. 429, 439 (1991); see also Michigan v. Chesternut, 486 U.S. 567, 573-74 (1988) (stating that an individual is seized if "a reasonable person would have believed that he was not free to leave" and noting that the test is an objective one) (internal quotation marks omitted).

"[A] consensual encounter does not amount to a seizure." United States v. Campbell, 486 F.3d 949, 954 (6th Cir. 2007). As the Supreme Court explained in Florida v. Royer, 460 U.S. 491, 497 (1983):

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. The person approached, however, need not answer any questions put to him; indeed, he may decline to listen to the questions at all and may go on his way. He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. If there is no detention -- no seizure within the meaning of the Fourth Amendment -- then no constitutional rights have been infringed.

Id. (citations omitted); see also Campbell, 486 F.3d at 954

-8-

(quoting Royer). "In short, because a consensual encounter does not amount to a seizure, a police officer does not need reasonable suspicion or probable cause before approaching an individual to make an inquiry." Campbell, 486 F.3d at 954 (citing United States v. Alston, 375 F.3d 408, 411 (6th Cir. 2004)).

"A seizure of an individual, on the other hand, occurs when 'under the totality of the circumstances, a reasonable person would have believed that he or she was not free to walk away.'" Id. (quoting Alston, 375 F.3d at 411). "The police officer's subjective intent in detaining an individual is irrelevant so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave." Id. (citing United States v. Mendenhall, 446 U.S. 544, 554 n. 6 (1980)). "'Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.'" Id. (quoting Mendenhall, 446 U.S. at 554). "Once a consensual encounter escalates to the point where the individual is 'seized,' the police officer must have a reasonable suspicion of criminal activity to justify a Terry stop, or probable cause to justify an arrest, in order for the seizure to comply with the Fourth

Amendment." Id.

In the present case, the initial encounter between the officers and Tuggle in the parking lot was a consensual encounter. Although there were five to ten officers with shirts and vests marked with the words "police," none of the officers drew their weapons, they did not activate their blue lights or sirens, they did not touch Tuggle or any of the individuals, they addressed the group in a calm and non-confrontational manner, and they only asked the group questions regarding what they were doing in the parking lot. Up to this point, a reasonable person would have believed that he or she was free to walk away. However, after the officers saw that one of the men was inebriated and Ward told the officers that he had a gun on him, the officers started checking all of the individuals' identification (including Tuggle's) and running their identification information on Station B. According to Detective Yancey, the individuals were told that they could not leave until their identification was checked. (Tr. at 33.) By requesting Tuggle's identification *and* conveying to him that he was not free to leave until his identification information was checked, the consensual encounter escalated to a Terry detention because, at that point, Tuggle was "seized." See Campbell, 486 F.3d at 954 (stating that officer's subjective intent is irrelevant "so long as that intent is not conveyed to the individual in a way that results in the individual believing that he or she is not free to leave").

When evaluating the constitutionality of a <u>Terry</u> detention, the court engages in a two-part analysis. First, it asks whether there was a proper basis for the detention, which is judged by examining whether the police officers were aware of specific and articulable facts which gave rise to reasonable suspicion. Second, the determination is made whether the degree of intrusion was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officers' conduct given their suspicions and the surrounding environment and circumstances. <u>United States v. Caruthers</u>, 458 F.3d 459, 464 (6th Cir. 2006).

The court finds that, based on the totality of the circumstances, there was a proper basis for the officers' detention of Tuggle. The officers initially observed seven to ten individuals gathered in front of a closed business, at midnight, in a "hot spot" high-crime area. The officers saw some of the individuals drinking alcoholic beverages and saw open beer cans on top of cars. Within minutes after approaching the individuals, the officers saw that one of the men was inebriated and learned that Ward had a gun on him. Although Tuggle did not appear to be inebriated or holding any alcoholic beverage, the officers had reasonable suspicion that criminal activity was afoot, including possible violations of Tennessee's open container law (Tenn. Code Ann. § 55-10-416) and criminal trespass law (Tenn. Code Ann. § 39-

14-405). Moreover, given the potentially dangerous combination of guns and alcohol, the officers were justified in detaining the individuals to further investigate what the individuals were doing or what they were about to do. Second, the court finds that the degree of intrusion was reasonably related in scope to the situation at hand. The officers never drew any weapons and did not handcuff anyone. While the officers did check Tuggle's identification, this intrusion was reasonable under the circumstances. Finally, the duration of the intrusion was limited, as only five to ten minutes elapsed between the time the officers first approached the individuals and the time that Detective Nemec asked Tuggle for permission to search his car.

Once the officers returned Tuggle's identification to him, the Terry detention de-escalated to a consensual encounter, as a reasonable person at that point would have believed that he or she was free to leave. See United States v. Geboyan, 367 F. App'x 99, 101 (11th Cir. 2010) (finding that traffic stop became a consensual encounter when officer returned defendant's driver's license and asked for consent to search car); United States v. Sanchez-Pena, 336 F.3d 431, 442-43 (5th Cir. 2003) (finding a consensual encounter where the officer returned the defendant's driver's license and insurance and then requested to conduct a search of the vehicle); United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000) (explaining that a traffic stop may become a consensual

encounter "if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority"). Detective Nemec saw the Towncar and asked the group (not Tuggle) who owned the car, and Tuggle volunteered that the car belonged to him. Detective Nemec asked Tuggle if he could search the vehicle and Tuggle responded, "Yeah, go ahead and search it, there is nothing in it." Tuggle consented to the search of his car during a consensual encounter, and not during an unreasonably prolonged Terry detention.

### III. CONCLUSION

For the reasons above, the court recommends that the Motion to Suppress be denied.

Respectfully submitted,

/s Tu M. Pham
_____
HON. TU M. PHAM
UNITED STATES MAGISTRATE JUDGE

December 30, 2010
_____
DATE

**NOTICE**

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**